EGGERS et al., Appellants, v. GENERAL REFRIGERA-
TION CO., Respondent.

No. 8891
Submitted September 28, 1949. Decided October 20, 1949.
210 Pac. (2d) 636

Messrs. Murch and Wuerthner, Great Falls, for appellant. Mr. Wuerthner argued the cause orally.

Messrs. Church and Harris, and Messrs. Johnson and Williams, all of Great Falls, for respondent. Mr. Williams argued orally.

MR. CHIEF JUSTICE ADAIR:

The substituted plaintiffs, C. W. Eggers and Charles Barclay, were president and vice-president respectively of the original plaintiff, Soft Water Service, Inc., a Montana corporation, hereinafter called the dealer, having its principal place of business at

No. 813 Central Avenue in Great Falls, Montana, where is sold at retail and serviced frozen food cabinets and lockers manufactured by the Beall Pipe and Tank Corporation of Portland, Oregon, hereinafter called the manufacturer.

The dealer operated under a written agreement with the manufacturer which granted to the dealer "the non-exclusive right during the life of this agreement to sell the products" of the manufacturer "in the following described territory: Great Falls, Montana. Also Lewistown, Shelby, Havre, Glasgow and Vicinities." The agreement granting such non-exclusive franchise required the dealer: To "purchase, set up and maintain in best operating condition, on a suitable show floor, one of each model of manufacturer's products at all times when products are available;" to "carry in stock at all times at least one of each size of all operating units which may require replacement; * * * to create and maintain at his expense a properly equipped installation and service department with a sufficient stock of repair parts and competent personnel and to keep all of manufacturer's products sold in the territory * * * in proper and satisfactory operating condition for the duration of the manufacturer's warranty period of such products without cost to the user," the obligation to give such service to survive the termination of the agreement.

The agreement was non-transferable, non-assignable and subject to cancellation by either party at any time with or without cause upon thirty days' notice in writing to the other party.

Mr. John E. Beall was the president of the Beall Pipe and Tank Corporation, an Oregon corporation, the manufacturer of the products sold by the dealer, and he was also the president of Beall, Inc., a Montana corporation, hereinafter called the distributor, being the duly authorized marketer of the manufacturer's products in Montana.

The respondent, General Refrigeration Company, is a Montana corporation, having its principal place of business in Great Falls. Its president was Sigmund C. Wacker and its secretary-treasurer Vern Baroch.

Respondent's officers, Wacker and Baroch, on a number of occasions during the fore part of August 1946, talked with the dealer's officers, Eggers and Barclay, concerning the possibility of respondent taking over the dealer's stock in trade, and its aforesaid franchise with the manufacturer. During these negotiations the dealer's agreement with the manufacturer was exhibited to and read by the officers of the respondent corporation, clause 16 whereof provides: "This agreement may not be transferred or assigned by the Dealer."

About the 13th or 14th of August 1946, Eggers, at Great Falls, placed a long distance telephone call for Mr. John E. Beall, president of the Beall Pipe and Tank Corporation, at Portland, Oregon. Eggers testified that on that occasion he talked with Mr. Beall; that Wacker and Baroch were there in the office with him where they could hear the conversation; and that following such telephone conversation he "told Mr. Baroch and Mr. Wacker it was all right with Mr. Beall to go ahead and make the transfer." The quoted testimony is disputed by Baroch who testified: "He [Eggers] made an attempt to contact someone in Portland in connection with the Beall corporation, I think it was John Beall, but he didn't complete the call for some reason," and that he, Baroch, was never present when Eggers "did talk to Mr. Beall or anybody else by telephone."

On August 16, 1946, after placing of the long distance call to the manufacturer, the dealer corporation by its president, Mr. Eggers, and the respondent corporation by its president, Mr. Wacker, signed a written agreement, the pertinent portions whereof provide:

"This Agreement, Made and entered into this 16th day of August, 1946, by and between Soft Water Service, Inc., a corporation, of Great Falls, Cascade County, Montana, hereinafter designated as the Party of the First Part; and General Refrigeration Company, a corporation, of the same city, county and state, hereinafter referred to as the Party of the Second Part:

"Witnesseth, That * * *

"Whereas, it is the desire of the parties to this agreement that

the Party of the First Part, will dispose, sell and assign all of its right, title and interest in and to said contract with the Beall Pipe and Tank Corporation to the Party of the Second Part, who hereby agrees to take over said contract on the terms, conditions and agreements hereinafter set forth.

"Now, Therefore, it is agreed by the Party of the First Part that *subject to the approval and consent of the Beall Pipe and Tank Corporation first had and given to the parties to this agreement and the payment of the consideration hereinafter mentioned,* that the Party of the First Part does hereby sell, transfer and set over to the Party of the Second Part all its right, title, interest and claim in and under said sales agreement had by and between the Party of the First Part and the said Beall Pipe and Tank Corporation.

"It is agreed by the Party of the Second Part that *for and in consideration of said sale,* transfer and assignment of said sales agreement *that it will pay to the Party of the First Part the sum of Two Thousand Dollars ($2000.00) in cash.*

"It is agreed by the Party of the Second Part that it will take over and take possession of and pay the listed prices of that certain stock in trade and merchandise now on hand and in the possession of the Party of the First Part on the basis of schedule of prices hereto set out in an inventory of said stock attached to this agreement, made a part hereof and to which reference is hereby made.

"It is agreed by the Party of the Second Part that it will also take over that certain car of merchandise which has heretofore been ordered by the Party of the First Part. In this connection, *it is agreed that it will pay to the Party of the First Part the listed prices of said car of merchandise* on the basis as set forth in the inventory and schedule of prices hereto attached, made a part hereof and to which reference is hereby made.

"*It is further agreed by and between the parties to this agreement that the terms, covenants and agreements hereinabove set forth are subject to the approval and consent of the Beall Pipe and Tank Corporation* of Portland, Oregon, *to the assignment,*

*transfer and relinquishment of the right, title and claim of the Party of the First Part under that certain sales agreement hereinabove mentioned* and made and entered into by and between the Party of the First Part and the Beall Pipe and Tank Corporation.

"*It is further agreed by the Party of the Second Part* that it will comply and abide by the terms, agreements and covenants of said sales agreement and take over and assume said sales agreement now in the possession of the Party of the First Part and *that it fully understands the provisions, covenants and agreements of said sales agreement.*

"It is understood and agreed that the Party of the First Part has to and including the 15th day of Sept., 1946, in which to procure the written consent and approval of the assignment of said sales contract from the Beall Pipe and Tank Corporation and that this contract is binding on the successors and assigns of the respective parties." (Emphasis supplied.)

About four days *after* signing the foregoing agreement, and at respondent's suggestion, the parties orally made and entered into a different agreement for the sale to respondent of the dealer's stock of frozen food lockers and parts then on hand and for the carload of lockers then on order. At this time the manufacturer's written "approval of the assignment of said sales contract" had not been procured nor had respondent paid to the dealer "the sum of Two Thousand Dollars ($2000.00) in cash."

Pursuant to the subsequent oral agreement respondent, on or about August 20, 1946: (1) Paid to the dealer a cash down payment of $1,000 instead of the $2,000 in cash called for by the previous written agreement and promised to pay to the dealer another $1,000 at a later time; (2) paid to the dealer the sum of $7,118 being the listed price of the dealer's stock of lockers and parts then on hand; and (3) on that day immediately accepted, received and took into its possession the dealer's entire stock of lockers and parts and took over and commenced selling lockers at retail in which it has since continuously engaged with the apparent approval and co-operation of the manufacturer.

The plaintiff Eggers testified that respondent's officers, Wacker and Baroch, asked plaintiffs to "wait for the other thousand dollars until another car of lockers came in," while respondent's witness Baroch testified: "It was to be paid when the franchise was delivered to us."

Plaintiff Eggers testified: "They didn't have the money, as I stated, and they asked us for time on the other half until this car of lockers came in. We had the order in our name, Soft Water Service, and they would pay that additional thousand dollars at that time. Mr. Baroch spoke up and said, 'You have all the chance in the world to get that thousand dollars because they are coming in your name and you don't turn them over until you get the thousand dollars.'

"Q. Did you consent to that? A. Yes, that was about all we could do. We objected to it but we couldn't do anything else much."

On his direct examination respondent's witness Baroch testified: "At the time the contract was signed they thought we would pay them over the two thousand dollars immediately, and we decided that was paying them out entirely the full bonus for the franchise, and in reality they had not delivered us anything in regard to the transfer of the franchise, so we agreed to pay them a thousand dollars when the franchise was delivered to us."

On cross-examination Mr. Baroch testified:

"Q. Now, as a matter of fact, didn't you ask Mr. Eggers and Mr. Barclay for additional time on the thousand dollars, saying that when the carload of frozen food lockers came in that they ordered that you would pay that other thousand dollars? A. We didn't ask for any extension of time. At the time the contract was signed it called for two thousand dollars payment.

"Q. Cash? A. Yes, and *Mr. Eggers, as soon as the contract was executed, reminded us there was two thousand dollars that was immediately due,* so he thought we were just going to hand him two thousand dollars, *so we decided* that was too much to pay over until after we had the transfer of the franchise that they had agreed to deliver, and *we would pay them one thousand*

212

*dollars, the one half, and then when he delivered the franchise that we would pay the other thousand dollars immediately.*

"Q. You know there was a conversation about the carload of frozen food lockers? A. Yes.

"Q. What was that conversation? A. There was no specific time. They said they had ordered a carload of frozen food lockers and wanted to know if we would take them. We indicated we would want them, and there had been a price increase on the food lockers that was just about equal to the additional thousand they would have coming. In fact, *the price increase I believe was $1040.00 and Clyde Eggers said, 'We will call it an even thousand and then if you want to pay us that when the carload arrives we will just add it on to the old list price, and then when the carload arrives* we will have it diverted to General Refrigeration Company and *you can take up the sight draft on it and it will be all square.'* \* \* \*

"Q. Didn't you say to Mr. Eggers and Mr. Barclay—now you are going to be secured for this other thousand dollars because the carload of frozen food lockers is coming to you, did you say that to them? \* \* \* A. I never mentioned that. They felt secure in their own minds but I didn't mention that in a statement.

"Q. When did that carload of frozen food lockers arrive? A. In September, 1946.

"Q. About what part of September? A. The latter part of September.

"Q. Did you tell Mr. Barclay or Mr. Eggers the carload of lockers had arrived? A. No.

"Q. You didn't tell them? A. They were shipped right to us.

"Q. Did you or General Refrigeration Company ever make any demand, written or otherwise, on Mr. Eggers or Mr. Barclay or Soft Water Service to get the written consent of Mr. Beall to the transfer of this franchise to you? A. At any time?

"Q. Well, until after they discovered you had made a new contract or prior to the time you made a new contract with them?

A. Prior to September 16, 1946?

"Q. Yes? A. I did not.

"Q. You made no demand upon them, that is, Soft Water Service Company or Mr. Barclay and Mr. Eggers prior to the time that the carload of lockers arrived? A. I did not.

"Q. Nor prior to the time that Mr. Eggers learned from you at the bowling alley that the lockers had arrived? A. We had not.

"Q. Now, under this franchise with Beall Incorporated you are handling the same merchandise that was handled by Soft Water Service under the other franchise with the Beall Pipe and Tank Corporation, are you? A. I am assuming so, yes. * * *

"Q. You are still selling these Beall frozen food lockers, are you not? A. Yes."

On September 16, 1946, respondent entered into a written agreement direct with the distributor Beall Inc., whereby respondent obtained the franchise for selling, at retail, in the territories of Great Falls, Lewistown, and vicinities, frozen food lockers, cabinets and parts manufactured by Beall Pipe and Tank Corporation. This agreement was entered into at Great Falls. John E. Beall, president both of the manufacturer and distributor corporations, was there present negotiating with respondent's officers, Wacker and Baroch, and personally signed the agreement granting the franchise to respondent.

Neither Eggers nor Barclay had any knowledge of the negotiations nor had they any information that Beall was in Great Falls. Save as to the territory assigned and the parties, the agreement of September 16, 1946, between respondent and the distributor, is identical in form and substance with the agreement of April 3, 1946, between the dealer and the manufacturer, Beall Pipe and Tank Corporation.

On September 20, 1946, being four days after the completion of the foregoing negotiations with Mr. John E. Beall, the car of frozen food lockers and cabinets theretofore ordered by the dealer, Soft Water Service, Inc., from the Manufacturer, Beall Pipe

and Tank Corporation, arrived in Great Falls. The dealer, Soft Water Service, Inc., had no notice or knowledge of the shipping or of the arrival of the car of merchandise which, instead of being consigned to it, was consigned directly to respondent who received it and apparently made payment therefor direct to the manufacturer.

During the first week in November 1946, Eggers, meeting Baroch at a bowling alley in Great Falls, remarked to the latter that "it was funny the car of lockers haven't come in," whereupon Baroch informed Eggers that the car of merchandise had reached Great Falls on September 20, 1946. This was the first knowledge the dealer, Soft Water Service, Inc., or its officers had of the arrival of the shipment.

At the trial Baroch, on cross-examination, testified: "Can you tell us how it came about that this carload of lockers came to you instead of Soft Water Service? A. No, I cannot.

"Q. You don't know? A. No.

"Q. Did you write and request them to? A. I did not."

On the day following the conversation at the bowling alley the plaintiffs, Eggers and Barclay, went to respondent's place of business and there demanded payment of the unpaid balance of $1,000. Respondent refused to pay such balance on the ground that plaintiffs "had not turned over the same franchise" which they had. Respondent at this time also exhibited to plaintiffs the written franchise of September 16, 1946, running direct to respondent from the distributor, Beall Inc. This was the first knowledge that plaintiff had that respondent, acting independently and dealing directly with John E. Beall, president of the distributor and manufacturer corporations, had obtained its own franchise for the selling of the manufacturer's products in Great Falls and elsewhere in Montana.

At no time prior to August 20, 1946, when it took over the dealer's stock of merchandise and paid the initial $1,000 in cash plus the list price of the dealer's stock on hand, had respondent ever sold or handled the manufactured products of the Beall Pipe and Tank Corporation. In fact respondent not having been

incorporated until August 5, 1946, was but fifteen days old when its purchased and took possession of the dealer's stock of lockers.

At no time after making the oral agreement of August 20, 1946, did respondent make any demand upon the dealer or plaintiffs to procure the manufacturer's written approval of the agreement of sale and purchase or of the assignment of the dealer's franchise to sell the manufacturer's products.

In January 1947 the dealer, Soft Water Service, Inc., as plaintiff, commenced this action against respondent to recover "judgment for the sum of $1000 together with interest at the legal rate from and after September 16, 1946."

In March 1947, Soft Water Service, Inc., was dissolved and Clyde W. Eggers and Charles T. Barclay, having succeeded to the corporation's right, title, interest, claim and cause of action, were substituted as parties plaintiff herein.

The cause was tried to the court sitting without a jury. The judgment denied plaintiffs any relief and awarded respondent $1,000 on its cross complaint. From the judgment so entered plaintiffs have appealed.

The answer comprises admissions, denials, three separate affirmative defenses and a cross complaint.

By reply plaintiffs place in issue the affirmative matter set forth in the answer and cross complaint.

The cross complaint alleges that under the terms of the written agreement of August 16, 1946, between it and Soft Water Service, Inc., the latter "had up to and including the 15th day of September, 1946, in which to procure the written consent and approval of the assignment of said sales contract from the Beall Pipe and Tank Corporation; and that Soft Water Service, Inc., did not procure said written consent and approval by the 15th day of September, 1946. That Soft Water Service, Inc., has failed to perform under the terms and conditions on its part to be performed, and the defendant herein has been damaged in the sum of Two Thousand Dollars ($2000.00)." The prayer is for

$2,000 damages with interest from September 16, 1946, for costs and that plaintiffs take nothing herein.

Plaintiffs rested their case upon the oral testimony of the plaintiffs, Eggers and Barclay, and three documents, viz., (A) the written agreement dated August 16, 1946, between Soft Water Service, Inc. and General Refrigeration Company; (B) the written agreement dated April 3, 1946, between Beall Pipe and Tank Corporation and Soft Water Service, Inc., and (C) the written agreement dated September 16, 1946, between Beall Inc. and General Refrigeration Company.

Respondent's case rests upon the oral testimony of its officers, Wacker and Baroch. No other evidence was introduced.

Much testimony was admitted over objection of opposing counsel that it would tend to alter or vary the terms of a written agreement. The trial court in overruling the objection observed that the testimony "may be admitted subject to the objection and taken under advisement." In this fashion the evidence was not confined to the issues framed by the pleadings and each party introduced much testimony respecting the oral agreement entered into subsequent to the signing of the written agreement of August 16, 1946.

The following occurred while respondent's counsel, Mr. Johnson, was examining respondent's first witness, Mr. Baroch: "Mr. Johnson: We are placed in a rather peculiar position. The plaintiffs have put in what they would like to call an executed oral agreement, to which we objected. In order that we may go into that further and show what we believe the facts to be, we must necessarily go into it, likewise, and we would like to do it without waiving any of our objections to the original testimony on varying a written agreement.

"Mr. Wuerthner: We are not stipulating to anything, and they are taking their chances when they put in their testimony.

"The Court: I don't know why you should not put it in *because the Court is going to decide this case on the facts and the law*. If any of this testimony is not relevant or material the Court is not going to consider it in determining this case. * * *

"Q. When did you pay over any money? A. It was a few days following the signing of the contract, after we started to remove the equipment from their establishment.

"Q. What was the agreement with respect to payment of the balance, the remaining one thousand dollars?

"Mr. Wuerthner: That is objected to as varying the terms of a written agreement. It speaks for itself. * * *

"Q. Well, what was the discussion with respect to payment of the two thousand dollars with Mr. Eggers and Mr. Barclay?

"Mr. Wuerthner: That is objected to unless the time is placed when the discussion was had.

"Q. Did you have any discussion with Mr. Eggers and Mr. Barclay with respect to payment on this contract? A. Yes.

"Q. Where was that discussion held? A. In their office.

"Q. Who was present at that time? A. Mr. Barclay and Mr. Eggers.

"Q. Who else? A. Mr. Wacker. * * *

"Q. What was your discussion with respect to that payment?

"Mr. Wuerthner: We object to that unless it is stated it was before or after signing of the contract.

"Mr. Johnson: It was after.

"Mr. Wuerthner: We still object.

"The Court: What payment do you refer to?

"Mr. Johnson: The payment of the second thousand dollars.

"Q. What was the discussion at that time with respect to the payment of the second thousand dollars?

"Mr. Wuerthner: That is·objected to on the grounds it is varying the terms of a written agreement.

"The Court: He may answer. A. It was to be paid when the franchise was delivered to us."

It is clear from the record that irrespective of the issues presented by the pleadings herein the trial court permitted both parties to introduce testimony purporting to show exactly what was said and done by all concerned *after* the signing of the written agreement of August 16, 1946, the trial judge announcing that he "was going to decide this case on the facts and the law."

The language of the written agreement of August 16, 1946, is clear and explicit. It rests on two conditions precedent. The first condition was the procuring of the manufacturer's written approval thereto. The second condition was the payment by respondent to the dealer of the consideration "of Two Thousand Dollars ($2000.00) in cash." Neither of these conditions precedent was ever performed. The manufacturer's approval has not been obtained. The respondent has not paid the $2,000 in cash. The signing of the written agreement by the dealer and the respondent was no more than an offer which would ripen into a contract only if and when approved by a third party, namely, the manufacturing corporation, and if and when the respondent paid the dealer the sum of $2,000 in cash.

The language of a contract is to govern its interpretation, if the language is clear and explicit. Sec. 7529, R. C. M. 1935.

Section 7402, R. C. M. 1935, provides: "A condition precedent is one which is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed."

"Before any party to an obligation can require another party to perform any act under it, he must fulfill all conditions precedent thereto imposed upon himself." Sec. 7405, R. C. M. 1935.

In 3 Williston on Contracts, Rev. Ed., sec. 665, p. 1909, it is said: "Breach or non-concurrence of a condition prevents the promisee from acquiring a right, or deprives him of one, but subjects him to no liability."

In 6 R. C. L., Contracts, sec. 290, p. 904, it is said: "Conditions precedent call for the performance of some act or the happening of some event after a contract is entered into and upon the performance or happening of which its obligations are made to depend."

In 12 C. J., Condition Precedent, sec. 1, p. 408, note 24, it is said: "It seems to be agreed * * * where the condition is in the nature of a consideration for the concession, its performance will be regarded as intended to precede the vesting of any right, and so a condition precedent." See, also, 15 C. J. S. page 811.

In City of New Orleans v. Texas & Pacific Railway Co., 171

U. S. 312, 18 S. Ct. 875, 883, 43 L. Ed. 178, 186, it is said: "Where the undertaking on one side is in terms a condition to the stipulation on the other,—that is, where the contract provides for the performance of some act, or the happening of some event, and the obligations of the contract are made to depend on such performance or happening,—the conditions are conditions precedent."

In State ex rel. Nagle v. Stafford, 97 Mont. 275, 289, 34 Pac. (2d) 372, 379, this court in considering the meaning of the words "subject to the confirmation" said: " 'Subject to' means subservient or subordinate to (Engelstein v. Mintz, 345 Ill. 48, 177 N. E. 746; Byrne v. Drain, 127 Cal. 663, 60 Pac. 433), and embodies the command that the act shall not be effective until the condition is complied with. Thus orders taken by a representation, 'subject to confirmation' by his house, do not ripen into contracts until confirmed." (Citing cases.)

The entire written agreement was "subject to the approval ██ * * * of the Beall Pipe and Tank Corporation first had and given to the parties." This provision was for the sole benefit of respondent who was buying the business and who required a working arrangement with the manufacturer to handle its products. The provision that the respondent should pay to the dealer $2,000 in cash was solely for the benefit of the dealer who was turning over its business and stock of lockers to respondent. The parties to the executory written agreement were privileged to terminate it at any time by mutual consent independently of any express agreement so providing and it is immaterial whether such termination be characterized an abandonment, cancellation, mutual rescission or waiver. The effect is the same—to relieve the parties from going forward under the written instrument, and this may be accomplished by parol, and the facts of its having been done established by evidence of the acts and declarations of the parties. Ogg v. Herman, 71 Mont. 10, 20, 227 Pac. 476; Kester v. Nelson, 92 Mont. 69, 10 Pac. (2d) 379, 380.

Although not obligated to accept any of the merchandise or

do anything until the manufacturer's approval was first had and given the record is clear that some three or four days after signing the agreement of August 16, 1946, respondent voluntarily proposed that it be allowed to immediately take over all the dealer's lockers and parts in stock as well as those on order by paying the dealer the list price thereof plus $1,000 in cash and the further sum of $1,000 at a later date. This proposal was accepted by the dealer who on August 20, 1946, delivered to respondent possession of its stock of lockers and parts and thereupon immediately went out of the locker business which respondent took over and has since continuously operated.

The foregoing acts and conduct of the parties constitute a ▆ waiver and abandonment of the written agreement of August 16, 1946. The sale and transfer of the dealer's business and stock in trade was effected under the new oral contract so entered into about August 20, 1946. Klein Norton Co. v. Cohen, 107 Cal. App. 325, 290 Pac. 613.

From August 20, 1946, to September 16, 1946, respondent apparently operated under the franchise originally given to Soft Water Service, Inc., and on the latter date respondent, dealing direct with Mr. John E. Beall, president of both the manufacturer and the distributor corporations, obtained its own franchise upon terms to which it agreed and under which it has since operated.

In Smith v. Gunniss, 115 Mont. 362, 379, 144 Pac. (2d) 186, ▆ 191, this court quoted with approval from 12 Am. Jur., sec. 329, p. 885, as follows: "One who prevents or makes impossible the performance or happening of a condition precedent upon which his liability by the terms of a contract is made to depend cannot avail himself of its non-performance. In other words, he who prevents a thing from being done shall never be permitted to avail himself of the non-performance which he himself has occasioned."

Respondent's secretary-treasurer, Vern Baroch, on his direct examination testified: "We cover the territory on the south about to Wolf Creek, and on the north from Glacier National

Park to Glasgow, and as far east as Poplar at times, and on the east we covered the territory as far east as Winnett in Petroleum County.

"Q. When you say you covered that territory, what do you mean? A. Solicitation for sales, and making sales, and installing equipment and servicing equipment."

On his cross-examination the witness Baroch testified: "The contract we have with Beall Incorporated covers Lewistown and Great Falls and vicinities, and the contract we were supposed to have gotten from Soft Water Service covers in addition to those two towns, Glasgow, Havre and Shelby, and the contract we got from Beall Incorporated is through a distributor, and the contract was supposed to have been assigned to us for a manufacturer.

"Q. But both franchises are signed by Mr. Beall, president of both corporations, is that correct? A. That is right.

"Q. Under your franchise with Beall Incorporated you operated, as you testified, I believe, as far south as Wolf Creek, Montana, to the north Glacier Park to Glasgow and as far east as Poplar, and as far as Winnett. * * * So that in this territory mentioned you are selling Beall Frozen food lockers or cabinets in that territory, are you not? A. What territory did you mention? You have two contracts.

"Q. The Beall frozen food lockers? A. Yes.

"Q. You installed some up around Glacier Park, did you not? * * * Are you covering that territory? A. We have not any right in that territory. We have around Havre.

"Q. Around Havre you have installed some of these frozen food lockers? A. That is right.

"Q. Manufactured by Beall Pipe and Tank Corporation and distributed through Beall Incorporated? A. Yes, sir.

"Q. Any other place where you have installed them and I suppose serviced them? In the city of Great Falls, Lewistown, Harlowton and Virginia City. * * *

"Q. Or any place on the high line besides Havre? A. We didn't install any at Havre but south of Havre.

"Q. In Chouteau County? A. Yes.

"Q. What other counties in Montana have you sold those frozen food lockers besides Cascade County and Fergus County and Chouteau County? A. Teton County, Chouteau County, that just about covers it.

"Q. Any around Shelby or Cut Bank? A. No.

"Q. Or Conrad? A. Yes, around Valier.

"Q. Around Valier? A. Yes.

"Q. That is about seventy-five miles north of here? A. That is right. * * *

"Q. Can you tell us of any other counties on the high line where you have installed this equipment of frozen food lockers? A. No.

"Q. That is, manufactured by the Beall Pipe and Tank Corporation? A. No, I don't recall any counties, except those you have mentioned."

The evidence shows that respondent purchased the dealer's entire stock of lockers on hand as well as a carload on order on a rising market of which respondent received the full benefit and advantage, it being conceded that the wholesale price of the carload of lockers received on September 20th had advanced in the sum of $1,040 subsequent to the time the dealer's order was received and accepted by the manufacturer. Clearly the merchandise delivered was worth considerably more than respondent paid, resulting in additional profits to respondent rather than loss or damage.

There was no evidence introduced as to the loss of any sales or profits by reason of the failure of the newly created respondent corporation to obtain a franchise for more territory, than is described in the franchise which it obtained from Beall, Inc., and under which it now operates. Respondent's proof wholly fails to establish that it has suffered any of the damage alleged in its cross complaint. There being no evidence of damage the judgment rendered for respondent on its cross complaint may not be sustained on mere speculation and conjecture. Jurcec v. Raznik, 104 Mont. 45, 64 Pac. (2d) 1076; Rocky Mountain

Fire Ins. Co. v. Belcher, 96 Mont. 409, 31 Pac. (2d) 316; Rigney v. Swingley, 112 Mont. 104, 113 Pac. (2d) 344; McFarland v. Welch, 48 Mont. 196, 136 Pac. 394; 25 C. J. S., Damages, secs. 42 and 43, pp. 516-522, and cases cited in note 18, p. 521, also sec. 162, p. 819.

It stands undisputed that respondent agreed to pay a second $1,000 at a later date. If respondent agreed to pay this balance upon the arrival of the carload of lockers theretofore ordered, as plaintiffs say, then it should have been paid on September 20, 1946. If respondent agreed to pay the second $1,000 "when the franchise was delivered," as respondent says, then the money should have been paid on September 16, 1946, when respondent received from president John E. Beall of the manufacturer and distributor corporations the franchise to which it agreed and under which it has since operated.

Having dealt direct and independently for such franchise ██ without plaintiffs' knowledge and without requesting plaintiffs' assistance or cooperation, respondent may not now be heard to complain of plaintiffs' failure to obtain for respondent a better or more advantageous franchise than the one which respondent obtained for itself through private negotiations with Mr. Beall. Smith v. Gunniss, supra.

From the record before us it is clear that there is a balance of $1,000 owing by respondent to plaintiffs. Accordingly, the judgment is reversed and the cause remanded with directions to enter judgment in favor of plaintiffs and against the respondent, General Refrigeration Company, a corporation, for the sum of $1,000 together with interest thereon from September 20, 1946, and for plaintiffs' costs and disbursements.

Associate Justices Freebourn, Angstman, Metcalf and Bottomly, concur.